## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Randall Weinkauf, as trustee for the
next of kin of Riley Weinkauf,

        Plaintiff,

    v.

Hazelden Betty Ford Foundation and
Janice D. Tandler, M.D.,

        Defendants.

**COMPLAINT**

For his Complaint, Plaintiff Randall Weinkauf ("Plaintiff"), as trustee for the next of kin of Riley Weinkauf, hereby states and alleges as follows:

### **Introduction**

1.     At all times material hereto, decedent Riley Weinkauf ("Riley") was a twenty-eight-year-old man, who sustained an overdose and died while admitted to inpatient chemical dependency treatment at the Hazelden Betty Ford Foundation's ("Hazelden") Center City, Minnesota location. Plaintiff alleges that Riley's death was caused by the professional negligence (i.e., medical malpractice) and/or ordinary negligence of Hazelden employees, including Janice D. Tandler, M.D. ("Dr. Tandler").

### **Jurisdiction and Venue**

2.     Plaintiff was appointed as trustee for Riley's next of kin on October 27, 2017. *See* Exhibit A attached hereto.

3.     Riley was a resident of the State of Wisconsin at all times material hereto.

4.     Plaintiff is and was at all times material hereto a resident of the State of Wisconsin.

5.     Defendant Hazelden is and was at all times material hereto a Minnesota nonprofit corporation with its principal place of business located at 15251 Pleasant Valley Road, Center City, MN 55012.

6.     Upon information and belief, Dr. Tandler is a medical doctor employed by Hazelden, who resides in the State of Minnesota.

7.     Dr. Tandler was acting within the course and scope of her employment with Hazelden at all times material hereto, which included providing health care to patients at Hazelden's Center City location ("Center City").

8.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of citizenship between the parties and an amount in controversy in excess of $75,000.00, exclusive of costs and interests.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions occurred in Minnesota.

**Factual Background**

10.     Riley was a young man who suffered from chemical dependency issues, including addiction to opiates and amphetamines.

11.     In Fall 2017, Riley was offered admission into Center City's inpatient addiction treatment program.

12.     During his October 20, 2017 intake, Riley admitted to using drugs within the past 24 hours prior to admission.

13.     Riley's urine screen was positive for amphetamines, methamphetamine, benzodiazepines, and THC.

14.     Despite the positive urine screen, Riley was still admitted into Center City on October 20, 2017.

15.     Riley was initially placed in the medical unit for withdrawal observation and monitoring in addition to opiate observation.

16.     Upon information and belief, Dr. Tandler never met Riley in person on October 20, 2017 or any date thereafter.

17.     On or around October 20, 2017, Dr. Tandler did prescribe Riley with medications to reduce certain withdrawal symptoms.

18.     However, Dr. Tandler did not prescribe Riley with medication on October 20, 2017 or anytime thereafter that were intended to reduce Riley's opiate cravings.

19.     Upon information and belief, Dr. Tandler was responsible for prescribing and overseeing Riley's prescription medication regime throughout the entirety of Riley's stay at Center City.

20.     No later than October 21, 2017, Riley expressed cravings for opiates.

21.     Suboxone is a synthetic opiate that reduces cravings and relapse.

22.     Dr. Tandler, again without actually seeing Riley, directed that Riley was not to receive suboxone to treat his opiate cravings.

23.     Riley expressed cravings again on October 22, 2017.

24.     Shortly after his arrival at Center City, Riley made it clear that he was suffering from severe opiate cravings.

25.     Riley was moved to Center City's residential unit on October 22, 2017, despite the fact that he was considered high risk for relapse and despite the fact that he continued to report opiate cravings, which were not being medically treated.

26.     Shortly after his arrival in the medical unit, Center City staff learned that Riley was attempting to self-medicate his opiate cravings by seeking out drugs from fellow Center City residents.

27.     Despite this knowledge, neither Dr. Tandler nor any other medical doctor ever saw Riley or prescribed him with proper medication to treat his severe opiate cravings.

28.     In an October 23, 2017 group therapy class, the facilitator observed that Riley "slept during most of this session.  He appeared to be still in withdrawal and not tracking well with the group."

29.     On October 24, 2017, it was noted by Center City staff that "several [of Riley's] peers have expressed concern regarding [Riley] inquiring with multiple peers regarding where he could find chemicals, including marijuana and heroin."

30.     Still not being treated for his cravings or seen by a medical doctor, Riley also reported increasing irritability and anxiety on October 24, 2017.

31.     By no later than October 25, 2017, Riley was determined by Center City staff to be a good candidate for vivitrol.

32.     Vivitrol is a prescribed medication that reduces opiate cravings and prevents relapse by blocking the opiate receptors in the brain.

33.     Neither Dr. Tandler nor any other medical doctor at Center City prescribed vivitrol for Riley.

34.     On October 25, 2017, one of Riley's peers reported that Riley "was talking about chemicals on the unit and peers were concerned about him."

35.     Following that report, Riley informed a Center City addiction technician that "my meds are messed up and I am having suicidal ideation."

36.     Riley explained to the addiction technician that he was having severe opiate cravings and asked to see a doctor.

37.     The addiction technician classified Riley as engaging in drug and medicine seeking behavior.

38.     Once again, Riley did not meet with a medical doctor.

39.     However, Riley was transferred to the medical unit to monitor him for suicidality.

40.     On October 26, 2017, Riley was assessed for suicidality by a Center City psychologist and psychology intern.

41.     Riley "identified that he has frequent thoughts of harm to self and experiences difficulties controlling such thoughts."

42.     They observed that Riley "appears to be expressing such thoughts in response to not being given the withdrawal medication he desires while in treatment."

43.     The assessors charted that "[i]t was recommended for medical staff to meet with him today.  Since he is not going to be prescribed the medication he desires, his level of risk of harm to self may increase after meeting with medical staff.  It is

recommended for Mental Health staff on his unit to meet with him and reassess level of risk of harm to self after he meets with medical staff today prior to considering approval for transfer to his recovery unit.  His level of risk will likely need to be closely monitored while in treatment."

44.     Upon information and belief, Riley never met with a medical doctor on October 26, 2017.

45.     Upon information and belief, a proper risk assessment was never performed by medical staff on October 26, 2017.

46.     Also on October 26, 2017, rather than give Riley an opportunity to pursue treatment at Center City with the proper medications on board, Center City determined that Riley would be discharged from the program.

47.     It was determined that Riley would need to leave the program no later than the following day, October 27, 2017.

48.     Joseph Caravella LADC ("Caravella"), a licensed alcohol and drug abuse counselor employed by Center City recommended on October 26, 2017, that "considering the extent and acuity of his cravings in the here/now, [Riley] might need a lock-down facility and/or hospital based program to account for his safety, address his MH concerns, stabilize him, and then he might be more receptive to chemical health tx."

49.     Caravella knew that Riley was at risk of overdose death, writing that he gave Riley the following warning: "You have a history of using Opioids.  It is extremely important that you understand the risk of overdose and accidental death if you start taking Opioids again.  You have lost the tolerance you once had to Opioids, which means the

effects of using again could be fatal.  Because of your loss of tolerance, you cannot know

the Opioid dosage that will lead to overdose.  Your ability to breathe may be suppressed

and result in respiratory arrest and death."

50.     In sum, Center City was so concerned about the risk of harm that Riley

posed to himself, that it was discharging him from the program.

51.     Despite the extraordinary risk of harm Riley posed to himself, at

approximately 4:17 p.m. on October 26, 2017, Center City employees moved Riley from

the medical unit back into his residential unit, which Center City had already determined

was insufficient to meet Riley's needs.

52.     Riley was found unresponsive in his room by Center City staff at

approximately 2:30 a.m.

53.     They administered Narcan to Riley with no response.

54.     Riley was ultimately declared dead at the scene.

55.     Drug paraphernalia was found in Riley's possession and room at Center

City.

56.     The Medical Examiner found that Riley's cause of death was heroin

toxicity with methamphetamine use as a significant contributing factor.

57.     The investigation into how Riley obtained the drugs that killed him at

Center City revealed that, more likely than not, Riley obtained the drugs from another

resident who shall be referred to herein as "Resident X."

58.     Resident X "was known around the [Center City] campus as someone who

was known for trouble…"

59.     Upon information and belief, Center City employees knew or should have known that Resident X was engaging in behavior that made his presence at Center City dangerous to other residents, including improperly leaving campus for purposes of using and/or procuring illegal drugs.

60.     Resident X was in a different Unit at Center City, and as a result was someone with whom Riley was not supposed to fraternize.

61.     Nevertheless, Riley fraternized with Resident X at Center City on multiple occasions, and this was known to Center City staff.

62.     Resident X was found to be in possession of paraphernalia similar to the paraphernalia found in Riley's possession.

63.     Upon information and belief, Resident X was discharged from Center City shortly after Riley's death.

## Professional and Ordinary Negligence

64.     Plaintiff hereby realleges and incorporates by reference the allegations complained of above as if set forth specifically herein.

65.     Hazelden owed Riley a duty of protection.

66.     Hazelden and all Hazelden employees who were "health care providers," including but not limited to Dr. Tandler, owed Riley a duty to perform with the degree of skill and care ordinarily exercised by medical professionals under the same or similar circumstances.

67.     Hazelden and its employees knew that the risk of harm to Riley was exceedingly high.

8

68.     Prior to Riley overdosing, Hazelden knew or should have known that Resident X posed a danger to Riley and other Hazelden residents at Center City.

69.     Hazelden, through both its direct acts and omissions and the acts and omissions of its employees for which it is vicariously liable, breached its duties and was negligent in a number of ways, including but not limited to:

> a.  Dr. Tandler, in violation of the standard of care, failing to prescribe Riley with suboxone or vivitrol;
>
> b.  Failing to otherwise treat Riley in accordance with the degree of skill and care ordinarily exercised by medical professionals under the same or similar circumstances.
>
> c.  Failing to adequately supervise, monitor, and protect Riley;
>
> d.  Failing to adequately supervise, monitor, and control Resident X;
>
> e.  Failing to enact reasonable and appropriate security policies, protocols, and practices;
>
> f.  Failing to follow existing security policies, protocols, and practices; and
>
> g.  Failing to train, supervise, and monitor their employees.

70.     With respect to Hazelden employees who were acting in the capacity of health care providers, including Dr. Tandler, a declaration of expert review pursuant to Minnesota Statute Section 145.682, subdivision 4 is provided herewith.

71.     As a direct and proximate result of Hazelden's and Dr. Tandler's negligence, Riley died.

72.     Hazelden is vicariously liable for the acts and omissions of its employees described herein, including but not limited to Dr. Tandler's acts and omissions.

73.     As a direct and proximate result of Hazelden's and Dr. Tandler's negligence, Riley's next of kin have incurred funeral and burial costs, as well as other damages in connection with Riley's death, including but not limited to loss of the advice, comfort, assistance, companionship, protection, counsel, guidance, aid, and future relationships and other contributions Riley would have provided to them had he lived, in an amount to be proved at trial but in excess of Seventy-Five Thousand Dollars ($75,000.00).

74.     **A jury trial is hereby demanded.**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     A judgment against Defendants for damages in an amount to be determined by jury but in excess of $75,000.00, together with costs, disbursements, and all applicable pre-and post-judgment interest; and

2.     For such other relief as the Court deems just and equitable.

**Dated: February 3, 2020**

**NEWMARK STORMS DWORAK LLC**        **SIEBENCAREY, P.A.**

/s/ Jeffrey S. Storms
/s/ Paul C. Dworak                              /s/ Jeffrey M. Montpetit
Jeffrey S. Storms, #387240                  Jeffrey M. Montpetit, #291249
Paul C. Dworak, #391070                    901 Marquette Avenue, Suite 500
100 South Fifth Street, Suite 2100        Minneapolis, MN 55402
Minneapolis, MN 55402                      Telephone: 612.333.4500
Telephone: 612.455.7050                    Fax: 612.333.5970
Fax: 612.455.7051                              jeffrey.montpetit@knowyourrights.com
jeff@newmarkstorms.com
paul@newmarkstorms.com

*ATTORNEYS FOR PLAINTIFF*